# Exhibit A

LEGAL DEPARTMENT
NATIONAL PRISON PROJECT



May 22, 2020

**SENT VIA E-MAIL**
U.S. Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street SW, Stop 5009
Washington, DC 20536-5009
Email: ICE-FOIA@dhs.gov

Senior Director of FOIA Operations
The Privacy Office
U.S. Department of Homeland Security
245 Murray Lane SW
STOP-0655
Washington, D.C. 20528-0655
Email: foia@hq.dhs.gov

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW\**

*\*NOT ADMITTED IN DC;*
*PRACTICE LIMITED TO FEDERAL*
*COURTS*

Re: **FOIA Request Related to ICE Response to the COVID-19 Pandemic**

Dear Freedom of Information Officer:

The American Civil Liberties Union ("ACLU") submits this Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, request for production of records (the "Request") for records pertaining to the Trump Administration's response to the risk of COVID-19 in immigration detention facilities. The ACLU also seeks a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A) and 6 C.F.R. § 5.11(k), and expedited processing, pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(d). The justification for the fee waiver and expedited processing are set out in detail following the Request.

## I. Background

COVID-19 is a disease caused by a new strain of coronavirus that began spreading in December 2019.[1] The World Health Organization (WHO) has declared the novel coronavirus outbreak a pandemic.[2]

The first known case in the United States of COVID-19 was confirmed in the state of Washington on January 20, 2020.[3] The White House Coronavirus Task

---

[1] World Health Org., *Q&A on Coronaviruses (COVID-19)*, Mar. 9, 2020, https://www.who.int/news-room/qa-detail/q-a-coronaviruses.
[2] Dr. Tedros Adhanom Ghebreyesus, Dir. Gen., World Health Org., *Opening Remarks at the Media Briefing on COVID-19*, Mar. 11, 2020.
[3] Holshue ML, DeBolt C, Lindquist S, Lofy KH, et al., *First Case of 2019 Novel Coronavirus in the United States,* 382 N. Engl. J. Med. 929 (2020).

1

Force was established on January 29.[4] On January 31, the Trump Administration declared a public health emergency.[5]

From the outset of the COVID-19 crisis, it was clear that the impact on people living and working in immigration detention facilities was potentially catastrophic. As early as February 25, 2020, Dr. Scott Allen and Dr. Josiah Rich, medical experts to the Department of Homeland Security, shared concerns about the specific risk to immigrant detainees as a result of COVID-19 with the agency. These experts warned of the danger of rapid spread of COVID-19 in immigration detention facilities and recommended release of most immigrant detainees.[6]

ICE has released guidance in response to COVID-19, including requirements and suggestions for facilities to follow in response to the COVID-19 pandemic. These include: ICE's guidance on its website on COVID-19, https://www.ice.gov/coronavirus; ICE's protocol for a clinical response to COVID-19 ("Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)" version 6.0 issued March 6, 2020); the March 27, 2020 Memo entitled "Memorandum on Coronavirus Disease (COVID-19) Action Plan, Revision 1" ("ICE Action Plan"), from Enrique M. Lucero, Executive Associate Director, Enforcement and Removal Operations, addressed to Detention Wardens and Superintendents; the April 4, 2020 guidance from ICE Enforcement and Removal Operations (April 4 Memo); and the April 10, 2020 ICE ERO COVID-19 Pandemic Response Requirements guidance (April 10 Guidance).

ICE has received numerous letters from advocates, medical professionals, and Members of Congress emphasizing the increased risk faced by vulnerable populations in ICE detention facilities.[7] On April 17, 2020, Matthew Albence,

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

[4] Press Release, White House, *Statement from the Press Secretary Regarding the President's Coronavirus Task Force*, January 29, 2020, https://web.archive.org/web/20200303171648/https://www.whitehouse.gov/briefings-statements/statement-press-secretary-regarding-presidents-coronavirus-task-force/.

[5] White House, *Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Persons who Pose a Risk of Transmitting 2019 Novel Coronavirus*, Feb. 6, 2020, (https://web.archive.org/web/20200206080550/https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/).

[6] Letter from Dr. Scott Allen and Dr. Josiah Rich, Medical Experts for DHS, to House Comm. on Homeland Sec. (Mar. 19, 2020), available at https://www.documentcloud.org/documents/6816336-032020-Letter- From-Drs-Allen-Rich-to-Congress-Re.html#document/p4/a557238.

[7] Letter from 763 non-governmental organizations to Matthew T. Albence, Acting Director of ICE (Mar. 19, 2020), https://www.detentionwatchnetwork.org/sites/default/files/ICE%20Response%20to%20Coronavirus%20for%20Peo    ple%20Detained%20-%20Organizational%20Sign%20on%20Letter%20-%20Final.pdf; Catherine E. Shoichet,    *Doctors Warn of 'Tinderbox Scenario' if Coronavirus Spreads in ICE Detention*, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html; Letter from Rep. Carolyn    Maloney and Rep. Jamie Raskin to Acting Secretary of DHS Chad Wolf (Mar. 11, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-03-11.CBM%20and%20JR%20to%20Wolf-DHS%20re%20COVID-19.pdf; Letter from Rep. Carolyn Maloney and Rep. Jamie Raskin to Acting Secretary of DHS Chad Wolf (Apr.7, 2020),

Acting Director of ICE, stated that it had released fewer than 700 vulnerable individuals due to COVID-19, and that releasing non-violent immigrants to protect them from being infected and sickened with coronavirus could give the impression that the Administration "is not enforcing our immigration laws," which would be a "huge pull factor" and create a "rush at the borders."[8]

As of this date, ICE has reported 1,181 immigrant detainees with confirmed cases of COVID-19; 44 ICE employees at detention centers have also tested positive.[9] These numbers are likely a severe undercount and will continue to grow; ICE's public website does not list statistics for third-party contractors. Earlier this month, a 57-year-old ICE detainee with preexisting health conditions at Otay Mesa Detention Center in California died of COVID-19, a little over a month after the first confirmed infection at the facility.[10] Another immigrant detainee and at least two officers working at ICE detention facilities have also died from COVID-19 within the last month.

## II. Definitions

For purposes of this request, the term "DHS" means Department of Homeland Security, and any components, subcomponents, offices, or personnel therein.

For purposes of this request, the term "ICE" means Immigration and Customs Enforcement, and any components, subcomponents, offices, or personnel therein.

For purposes of this request, "IHSC" means the U.S. Immigration and Customs Enforcement Health Services Corps.

For purposes of this request, "third-party contractor" means any entity that provides services or personnel to immigration detention facilities.

For purposes of this request, the term "immigration detention facility" has the same scope used in 6 C.F.R. § 115.5.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-04-07.CBM%20JR%20to%20DHS%20re%20Protecting%20Immigrants_0.pdf.

[8] Press Release, House Committee on Oversight and Reform, DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus, Apr. 17, 2020, https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees.

[9] *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, *available at* https://www.ice.gov/covid19 (last checked May 22, 2020).

[10] Kate Morrisey, *Immigrant Detainee, Second Employee at Otay Mesa Detention Center Tests Positive for COVID-19*, San Diego Tribune, Apr. 3, 2020; Kate Morrissey, *First ICE Detainee Dies from COVID-19 After Being Hospitalized from Otay Mesa Detention Center*, San Diego Tribune, May 6, 2020.

3

For purposes of this request, "detainee" means any person detained in an immigration detention facility or holding facility.

For purposes of this request, the term "COVID-19" means the novel coronavirus disease that appeared in 2019, including both the novel coronavirus, the disease caused by that virus, and any terms commonly used to describe the current public health situation surrounding the disease. The term "COVID-19" should also be construed to include all the other commonly understood iterations of the term, including but not limited to Covid, COVID, COVID19, COVID2019, SARS-nCoV-2, etc.

For purposes of this request, "communications" means any transmittal of information from one person or entity to another by any means, including letters, correspondence, notes, memoranda, records, reports, papers, facsimiles, electronic mail (whether to, from, copied or blind copied), electronic mail generated from a hand held personal device including a Blackberry or iPhone, instant messaging, electronic mail generated from business or personal email accounts, internet relay chat, news group, group or collaboration servers, electronic bulletin boards, electronic discussion boards, dictation tapes, video recordings, audio recordings, digital recordings, memoranda, telegrams, telecopies and telexes, teleconference, collaboration servers (including share point servers), web-based or software virtual meetings including Web-X and any other meeting software and share point servers, and oral contact such as face-to-face discussions or meetings, telephone conversations, and voicemail messages.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

For purposes of this request, the term "documents" has the same scope used in Rule 34(a)(1) of the Federal Rules of Civil Procedure and shall encompass every writing or record of every type and description and every tangible thing that is or has been in the possession, custody, or control of the federal agency or agencies that are the subject of this request and their employees, to which they have access, or of which they have knowledge, including, but not limited to, newspaper articles, magazine articles, news articles, correspondence, letters, contracts, files, electronic mail, memoranda, stenographic notes, handwritten notes, drafts, studies, publications, books, pamphlets, catalogs, purchase orders, receipts, advertisements, direct mail solicitations, point-of-sale and point-of-purchase materials, notebooks, diaries, models, devices, pictures, photographs, films, audiotapes, videotapes, computer records, voice recordings, maps, reports, surveys, minutes, data compilations, and statistical compilations, regardless of whether a particular DOCUMENT is privileged or confidential, and regardless of the form of storage (including, but not limited to, paper, microfiche, magnetic tape, magnetic disk (hard disk or floppy disk), CD-ROM, DVD, optical disk, or electronic storage device).

### III. Requested Records

The ACLU seeks the release of all the following records, dated November 1, 2019 to the present unless otherwise noted, in the custody or control of ICE and DHS that are the subject of this request:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

1. All communications and documents related to COVID-19 in immigration detention facilities, including, but not limited to directives, policies, protocols, communications, reports, emails, letters, and trainings.

2. All communications and documents related to COVID-19 testing of detainees, ICE employees and contractors, and employees of third-party contractors at immigration detention facilities, including, but not limited to plans, directives, protocol, reports, spreadsheets, trainings, test results, statistics, or projection.

3. All communications and documents related to estimating or predicting COVID-19 infection and mortality among detainees, ICE employees and contractors, and employees of third-party contractors at immigration detention facilities.

3. All communications and documents regarding suspected or confirmed COVID-19-related exposures, infections, and deaths among people living and working in immigration detention facilities.

4. All communications and documents regarding the risk of spreading COVID-19 to the communities surrounding immigration detention facilities via movement of staff, third-party contractors, visitors, detainees, and others into, out of, and between those facilities, including transfers.

5. All communications and documents between or among immigration detention facility employees, including executive staff, supervisors, and staff, and/or third-party contractors regarding employees' access to hygiene, access to personal protective equipment, social distancing or lack thereof, or other risks of employee exposure to COVID-19 within Detention Facilities.

6. All communications and documents regarding COVID-19-related grievances or complaints, including, but not limited to, those discussing access to hygiene, protective equipment, social distancing or lack thereof, or other risks of exposure to COVID-19 within immigration detention facilities, and including but not limited to communications and documents regarding how immigration detention facility employees should respond to grievances or complaints in light of changing DHS and ICE guidance.

7. All communications and documents dated January 1, 2016 to the present regarding planned responses in the event of a potential infectious disease outbreak within immigration detention facilities, including but not limited to an outbreak of COVID-19.

8. All communications and documents reflecting the models or algorithms used to estimate or predict COVID-19 infection rates and likely mortality throughout the country, including whether any models or algorithms considered the spread of COVID-19 inside and through immigration detention facilities.

5

9. All communications and documents reflecting DHS's and ICE's assessment of social distancing inside immigration detention facilities, including but not limited to discussions regarding the importance of social distancing or the number of detainees who would have to be transferred outside immigration detention facilities to ensure social distancing inside them.

10. All communications and documents regarding COVID-19 testing within immigration detention facilities by ICE, Centers for Disease Control and Prevention ("CDC"), or any other federal agency, including but not limited to the number of tests administered to staff, detainees, and third party contractors, the number projected to be administered to staff, detainees, and third party contractors going forward, the number of positive tests of staff, detainees, and third party contractors, any plans to publicly report the results of those tests, the frequency with which test results will be reported publicly, and the timeline for administering those tests.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

11. All communications and documents regarding Congressional or state-based inquiries into COVID-19-related issues within immigration detention facilities, including but not limited to responses provided thereto.

12. All communications and documents containing or regarding guidance on release from immigration detention facilities to non-custodial settings, due to COVID-19, including but not limited to determination of which detainees are eligible for and will ultimately be cleared for transfer or release, including but not limited to determination of which detainees are vulnerable to COVID-19 contraction on the basis of health or age.

13. All policies and guidelines related to deportation of detainees who have tested positive for COVID-19 or who exhibit symptoms of COVID-19, including policies related to deportation air travel or flights.

14. All policies and guidelines related to deportation of detainees who have tested positive for COVID-19 or who exhibit symptoms of COVID-19, including policies related to deportation air travel or flights.

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), the ACLU requests that responsive electronic records be provided electronically in their native file format, if possible. Alternatively, the ACLU requests that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

### Fee Waiver Request

The ACLU requests that any fees associated responding to its FOIA request be waived pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k). Pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k), fees should be waived or

reduced if disclosure is (1) in the public interest because it is "likely to contribute significantly to public understanding of the operations or activities of the government" and (2) "not primarily in the commercial interest of the requester." Disclosure in this case meets both of these tests. The ACLU also requests a waiver or reduction of fees on the grounds that the ACLU qualifies as a "representative[] of the news media" and the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. § 5.11(d)(1).

> *1. Disclosure is in the public interest as it is likely to contribute significantly to the public's understanding of the operations and activities of government.*

*First*, disclosure pursuant to this Request is in the public interest. No event in recent memory has so suddenly changed the day to day life for nearly all Americans than the COVID-19 epidemic. Nearly every institution, economic sector, and government agency has had to make significant changes in response to the pandemic. The disclosure of this information, therefore, will inform the public about the operations and activities of ICE in response to the global pandemic. Insufficient information is publicly available regarding the issue in this Request, so the records sought are certain to contribute significantly to the public's understanding of
the response to the COVID pandemic inside of immigration detention facilities, with regarding to people living and working in these facilities, and those living in the surrounding communities.

The U.S. immigration detention system has grown significantly over the past three years, with a daily average detained population close to 45,000 people before the pandemic.[11] In the midst of the COVID-19 pandemic, immigration detention has the potential to be a hotbed for transmission of COVID-19, with conservative estimates projecting that 72% of ICE detainees will become infected with COVID-19 within three months.[12] With ICE staff going in and out of ICE detention facilities across the country on a daily basis, and returning to their families and communities, the spread of COVID-19 in ICE facilities has a direct impact on the day-to-day life of people who live in the communities with ICE detention facilities.

Given the significant attention to this issue by advocacy groups, medical experts, media groups, and legislators, the requested records will contribute significantly to the public's understanding of the treatment of detainees held by ICE during the COVID-19 outbreak.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

[11] Dara Lind and Javier Zarracina, *By the Numbers: How 2 Years of Trump's Policies Have Affected Immigrants*, Vox (Jan. 19, 2019, 4:38 PM), https://www.vox.com/policy-and-politics/2019/1/19/18123891/trump-immigration-statistics.

[12] Michael Irvine, et al., *Modeling COVID-19 and Impacts on U.S. Immigration and Enforcement (ICE) Detention Facilities*, J. Urban Health (forthcoming 2020), https://whistleblower.org/wp-content/uploads/2020/04/Irvine_JUH_ICE_COVID19_model.pdf.

7

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

2. *Disclosure is not primarily in the commercial interest of the ACLU.*

*Second*, the ACLU is not filing this request to further a commercial interest. The ACLU is a 501(c)(3) nonprofit organization and therefore has no commercial interest. The ACLU intends to make any relevant information obtained through this FOIA available to the public.[13] The ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students, and faculty, for no cost or for a nominal fee.

The ACLU also publishes, analyzes, and disseminates information through its heavily visited website, www.aclu.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The ACLU website also includes many features on information obtained through FOIA requests. For example, the ACLU's "Predator Drones FOIA" webpage, https://www.aclu.org/national-security/predator-drones-foia, contains commentary about the ACLU's FOIA request, press releases, analysis of the FOIA documents, numerous blog posts on the issue, documents related to litigation over the FOIA request, frequently asked questions about targeted killing, and links to the documents themselves.[14] The ACLU has also published a number of charts and explanatory materials that collect, summarize, and analyze information it has obtained through the FOIA. For example, in February 2017 the ACLU produced an analysis of documents released in response to a FOIA request about the TSA's behavior detection program. The ACLU plans to analyze, publish, and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use and the ACLU plans to disseminate the information disclosed as a result of this Request to the public at no cost.

3. *The ACLU also qualifies for a fee waiver because it is representative of the news media and the records are not sought for commercial use.*

The ACLU is also entitled to a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii)(III); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an

---

[13] *See* 6 C.F.R. § 5.11(k)(1)(ii); 6 C.F.R. § 5.11(k)(3).
[14] The Torture Database, https://www.thetorturedatabase.org (last visited Sept. 19 2019); *see also Countering Violent Extremism FOIA Database*, ACLU, https://www.aclu.org/foia-collection/cve-foia-documents; *TSA Behavior Detection FOIA Database*, ACLU, https://www.aclu.org/foia-collection/tsa-behavior-detection-foia-database; *Targeted Killing FOIA Database*, ACLU, https://www.aclu.org/foia-collection/targeted-killing-foia-database.

8

organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *ACLU v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding non-profit public interest group to be "primarily engaged in disseminating information").

Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU's work and are among its primary activities. For example, the ACLU regularly publishes *ACLU Magazine* that reports on and analyzes civil liberties-related current events. The magazine is disseminated to over 950,000 households. The ACLU also publishes regular updates and alerts via email to approximately 4 million subscribers (both ACLU members and nonmembers). These updates are additionally broadcast to 4.9 million social media followers (members and non-members). The magazine, email, and social-media alerts often include descriptions and analysis of information obtained through FOIA requests.

The ACLU also regularly issues press releases to call attention to documents obtained through FOIA requests, as well as other breaking news,[15] and ACLU attorneys are interviewed frequently for news stories about documents released through ACLU FOIA requests.[16] Similarly, ACLU national projects regularly publish and disseminate reports that include a description and analysis of government documents obtained through FOIA requests.[17] This material is broadly

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

[15] *See, e.g.*, Press Release, ACLU, U.S. Releases Drone Strike 'Playbook' in Response to ACLU Lawsuit (Aug. 6, 2016), https://www.aclu.org/news/us-releases-drone-strike-playbook-response-aclu-lawsuit; Press Release, ACLU, Secret Documents Describe Graphic Abuse and Admit Mistakes (June 14, 2016), https://www.aclu.org/news/cia-releases-dozens-torture-documents-response-aclu-lawsuit; Press Release, ACLU, U.S. Releases Targeted Killing Memo in Response to Long-Running ACLU Lawsuit (June 23, 2014), https://www.aclu.org/national-security/us-releases-targeted-killing-memo-response-long-running-aclu-lawsuit.

[16] *See, e.g.*, Cora Currier, *TSA's Own Files Show Doubtful Science Behind Its Behavioral Screen Program*, Intercept, Feb. 8, 2017, https://theintercept.com/2017/02/08/tsas-own-files-show-doubtful-science-behind-its-behavior-screening-program/ (quoting ACLU attorney Hugh Handeyside); Catherine Thorbecke, *What Newly Released CIA Documents Reveal About 'Torture' in Its Former Detention Program,* ABC, June 15, 2016, http://abcn.ws/2jy40d3 (quoting ACLU staff attorney Dror Ladin); Nicky Woolf, *US Marshals Spent $10M on Equipment for Warrantless Stingray Device*, Guardian, Mar. 17, 2016, https://www.theguardian.com/world/2016/mar/17/us-marshals-stingray-surveillance-airborne (quoting ACLU attorney Nate Wessler).

[17] *See, e.g.*, Manar Waheed, *Customs and Border Protection Violated Court Orders During the First Muslim Ban Implementation* (Jan. 24, 2018, 3:45 PM), https://www.aclu.org/blog/immigrants-rights/ice-and-border-patrol-abuses/customs-and-border-protection-violated-court; Vera Eidelman, *We Sued for Records About Trump's Muslim Bans. Here's What We Found Out.* (Oct. 24, 2017, 3:15 PM), https://www.aclu.org/blog/immigrants-rights/ice-and-border-patrol-abuses/we-sued-records-about-trumps-muslim-bans-heres; Carl Takei, *ACLU-Obtained Emails Prove that the Federal Bureau of Prisons Covered Up Its Visit to the CIA's Torture Site* (Nov. 22, 2016, 3:15 PM), https://www.aclu.org/blog/speak- freely/aclu-obtained-emails-prove-federal-bureau-prisons-covered-

circulated to the public and widely available to everyone for no cost or, sometimes, for a small fee.

The ACLU also regularly publishes books, "know your rights" materials, fact sheets, and educational brochures and pamphlets designed to educate the public about civil liberties issues and government policies that implicate civil rights and liberties. The ACLU publishes a widely read blog where original editorial content reporting on and analyzing civil rights and civil liberties news is posted daily. *See* https://www.aclu.org/blog. The ACLU creates and disseminates original editorial and educational content on civil rights and civil liberties news through multi-media projects, including videos, podcasts, and interactive features. *See* https://www.aclu.org/multimedia.

Underscoring this point, courts have found that other organizations whose mission, function, publishing, and public education activities are similar in kind to the ACLU's are "representatives of the news media" as well. *See, e.g., Cause of Action v. IRS*, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Defense*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989); *Judicial Watch, Inc. v. DOJ*, 133 F. Supp. 2d 52, 53-54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[18]

As a representative of the news media, the ACLU plans to analyze and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use. On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU as a "representative of the news media."[19] A fee waiver would fulfill

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

its-visit-cias-torture; Galen Sherwin, ACLU, Leaving Girls Behind: An Analysis of Washington D.C.'s "Empowering Males of Color" Initiative (May 27, 2016), https://www.aclu.org/report/leaving-girls-behind.

[18] Courts have found these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information and public education activities. *See, e.g., Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d 5; *Nat'l Sec. Archive*, 880 F.2d at 1387; *see also Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *Judicial Watch, Inc.*, 133 F. Supp. 2d at 53-54.

[19] For example, in May 2016, the FBI granted a fee-waiver request regarding a FOIA request submitted to the DOJ for documents related to Countering Violent Extremism Programs. In April 2013, the National Security Division of the DOJ granted a fee-waiver request with respect to a request for documents relating to the FISA Amendments Act. Also in April 2013, the DOJ granted a fee-waiver request regarding a FOIA request for documents related to "national security letters" issued under the Electronic Communications Privacy Act. In August 2013, the FBI granted the fee-waiver request related to the same FOIA request issued to the DOJ.

Congress's legislative intent in amending FOIA.[20] Additionally, on account of these factors, the ACLU has not been charged fees associated with responding to FOIA requests on numerous occasions.[21]

In sum, because disclosure of the requested documents is in the public interest and not primarily in the commercial interest of the requester, and because the ACLU is a representative of the news media, the ACLU is entitled to a total waiver of fees associated with this Request and should, in no event, be required to pay more than reasonable standard charges for document duplication. In the event that you decide not to waive the fees, please provide me with prior notice so that we can discuss arrangements.

### Expedited Processing Request

The ACLU requests expedited processing of this Request pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); *see also* 6 C.F.R. 5.5(e)(1)(ii).

> 1. *The ACLU is an organization primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The ACLU is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II). As detailed *supra*, the ACLU has the ability and intention to widely disseminate the requested information through a variety of sources, including reports, newsletters, news briefings, right-to-know handbooks, and other materials, to the public at no cost. Indeed, obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU's work and are among its primary activities. *See ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004)

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

[20] *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requestors.'") (citation omitted); *Citizens for Responsibility and Ethics in Washington v. U.S. Dept. of Educ.*, 593 F. Supp. 2d 261, 268 (D.D.C. 2009) ("[FOIA's] purpose . . . is to remove the roadblocks and technicalities which have been used by . . . agencies to deny waivers.") (internal quotation marks and citation omitted).

[21] For example, in August 2016, the ICE FOIA Office and DHS Privacy Office both granted fee waivers to the ACLU for a FOIA request seeking a DHS OIG super-memorandum and ICE's response to that memorandum. Similarly, in March 2016, the ICE Office of the Principal Legal Advisor granted a fee waiver to the ACLU for a FOIA request seeking records about selected deaths in detention, reversing an incorrect denial of a fee waiver by the ICE FOIA Office. In July 2015, the ICE Office of the Principal Legal Advisor granted a fee waiver to the ACLU for a FOIA request seeking records about the use of segregation in ICE detention, reversing an incorrect denial of a fee waiver by the ICE FOIA Office.

(finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").[22] Moreover, as mentioned *supra*, the ACLU intends to distribute the information obtained through this FOIA request via the ACLU website and/or other means available to us.

### 2. *The records sought are urgently needed to inform the public about actual or alleged government activity.*

The requested records are also urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, the requested records pertain to ICE's response to the COVID-19 pandemic. As described *supra*, this is a matter of widespread media and public interest, and the requested records will inform the public concern of this activity by ICE. 5 U.S.C. § 552(a)(6)(E)(i)(I). Nearly every day, we learn more information about the way that the COVID-19 pandemic is impacting different parts of society, from government to health care, to education, and entertainment. Yet relatively little is known about ICE's response to the COVID-19 pandemic. This request will educate the public about the government's actions in the face of this crisis.

Furthermore, denial of expedited disclosure of the requested records involving ICE's response to COVID-19 could "reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I); 6 C.F.R. § 5.5(d)(1)(i). As of April 29, 2020, the COVID-19 pandemic has killed over 60,000 people and infected over 1,000,000 people.[23] According to ICE's website, just 995 people had been tested for COVID-19 as of April 29.[24] Yet, 449 people had tested positive, along with 36 ICE staff.[25] The requested records are essential to fully understand the government's role in the detention and treatment of individuals who are in its custody.

Given the foregoing, the ACLU has satisfied the requirements for expedited processing of this Request.

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi) and 6 C.F.R. § 5.5(d)(3).

---

[22] Courts have found that the ACLU as well as other organizations with similar missions that engage in information-dissemination activities similar to the ACLU are "primarily engaged in disseminating information." *See, e.g.*, *Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 11.

[23] Joe Fox, et al., *60,463 People Have Died from the Coronavirus in the U.S.*, WASHINGTON POST (Apr. 29, 2020), https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=lk_inline_manual_3.

[24] *Confirmed Cases*, IMMIGRATION AND CUSTOMS ENFORCEMENT (Apr. 29, 2020), https://www.ice.gov/coronavirus.

[25] *Id.*

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Thank you for your prompt attention to this Request. We look forward to your reply to this Request within ten (10) business days, as required under 5 U.S.C. § 552(a)(6)(A)(I) and 6 C.F.R. § 5.5(e)(4). Please furnish all responsive records to:

> Eunice Cho
> ACLU National Prison Project
> 915 15th St. NW, 7th Floor
> Washington, DC 20005
> echo@aclu.org

If this Request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect the release of all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information, or to deny a waiver of fees. Please call me at (202) 548-6616 if you have any questions or wish to obtain further information about the nature of the records in which we are interested.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Respectfully,

Eunice Cho
American Civil Liberties Union
National Prison Project
915 15th St. NW, 7th Floor
Washington, DC 20005
echo@aclu.org