## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| AMERICAN CIVIL LIBERTIES UNION, |
| *Plaintiff*, |
| v. |
| DEPARTMENT OF HOMELAND SECURITY, *et al.*, |
| *Defendants.* |

Civil Action No. 20-3204 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

This Freedom of Information Act ("FOIA") case is before the Court on cross-motions for partial summary judgment. Dkt. 40; Dkt. 41. At issue is whether the Department of Homeland Security ("DHS") must search for responsive records maintained by the DHS Office of the Inspector General ("OIG"). On May 22, 2020, Plaintiff American Civil Liberties Union ("ACLU") submitted its FOIA request to DHS's Privacy Office seeking records "in the custody or control of ICE [U.S. Immigration and Customs Enforcement] and DHS" relating to "the Trump Administration's response to the risk of COVID-19 in immigration detention facilities." Dkt. 40-5 at 2, 5 (Pl.'s Ex. 1). The ACLU maintains that it properly submitted its request to the Privacy Office, which is authorized to accept FOIA requests on behalf of other DHS components, including OIG; that it was evident at the time the request was submitted that OIG had responsive records; that this fact became crystal clear before DHS began its search; and that the records that DHS has located to date confirm that OIG has responsive records. *See generally* Dkt. 40-2.

DHS disagrees.  It argues that, if the ACLU wanted DHS to search files maintained by OIG, it should have submitted a FOIA request to OIG; that the Privacy Office was required only to forward the ACLU's request to the DHS "component(s) that [the Privacy Office] determine[d] to be most likely to maintain the records that [we]re sought," 6 C.F.R. § 5.3(a)(2); that the Privacy Office satisfied this mandate when it forwarded the ACLU's request to ICE; and that the Privacy Office was not on reasonable notice that OIG is likely to have responsive records in its files.  *See generally* Dkt. 41-1.

For the reasons explained below, the Court concludes that the ACLU has the better of the arguments.  The Court will, accordingly, grant the ACLU's motion for partial summary judgment, Dkt. 40, will deny DHS's cross-motion for partial summary judgment, Dkt. 41, and will direct that DHS include OIG in its search for responsive records.

## I.  BACKGROUND

On May 22, 2020, the ACLU submitted identical FOIA requests to ICE and DHS's Privacy Office, seeking "records pertaining to the Trump Administration's response to the risk of COVID-19 in immigration detention facilities."  Dkt. 40-5 at 2 (Pl.'s Ex. 1); *see also* Dkt. 40-1 at 1 (Plaintiff's Statement of Undisputed Material Fact ("Pl.'s SUMF") ¶ 1).[1]  Among other things,

---

[1] Under Local Civil Rule 7(h)(1), "[a]n opposition to . . . a motion [for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  If the opposing party fails to comply with this requirement, "the Court may assume that facts identified by the moving party in its statement of material facts are admitted."  *Id.*; *see also* Dkt. 9 at 5 (Standing Order in Civil Cases) ("The party responding to a statement of material facts must respond to each paragraph with a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied.").  Because DHS failed to respond to the ACLU's statement of material facts, *see* Dkt. 43 at 6 n.1; *see also* Dkt. 46 at 5 n.1, the Court will assume that the facts identified in the ACLU's statement of material facts are conceded for purposes of the ACLU's motion.

those requests sought "[a]ll communications and documents regarding COVID-19-related grievances or complaints, including, but not limited to, those discussing access to hygiene, protective equipment, social distancing or lack thereof, or other risks of exposure to COVID-19 within immigration detention facilities . . . ."  Dkt. 40-5 at 6 (Pl.'s Ex. 1).  A few days later, DHS acknowledged receipt of the FOIA requests and explained that "[t]he Privacy Office will be coordinating a search with ICE and will respond to your request on behalf of DHS and its components."  Dkt 40-6 at 2–4 (Pl.'s Ex. 2).  At the same time, DHS granted the ACLU's request for expedited treatment.  *Id.*  According to DHS, the Privacy Office determined that ICE was the DHS component most likely to have responsive records, and it thus forwarded the request to the ICE FOIA office.  Dkt. 41-3 at 1–2 (Defendants' Statement of Undisputed Material Fact ("Defs.' SUMF") ¶ 2).  On June 2, ICE acknowledged receipt of the FOIA request that the ACLU had directly submitted to it, and it confirmed that the ICE "response . . . w[ould] be coordinated by the DHS Privacy Office."  Dkt. 40-7 at 2 (Pl.'s Ex. 3).

On June 10, 2020, the Privacy Office emailed the ACLU asking it to "narrow the part of the request where you seek 'communications,'" by either "identify[ing] specific record custodians" or "specific detention facilities, names of record custodians[,] or position titles."  Dkt. 40-8 at 2 (Pl's Ex. 4).  Two days later, the ACLU "agree[d] to narrow [its] request and specif[ied]" a number of detention facilities "subject to the search."  Dkt. 40-9 at 2 (Pl.'s Ex. 5).  The Privacy Office, in turn, conveyed that supplemental information to ICE.  Dkt. 41-3 at 2 (Defs.' SUMF ¶ 4).

On June 18, 2020, OIG released a report entitled *Early Experiences with COVID-19 at ICE Detention Facilities*.  Dkt. 40-12 at 2 (Pl.'s Ex. 8).  In the report, OIG explained that it had surveyed 188 detention facilities "from April 8 to 20, 2020, regarding their experiences and

3

challenges managing COVID-19 among detainees in their custody and among their staff." *Id.* at
4.  The report included information on the spread of COVID-19 in ICE detention facilities,
measures facilities were taking to prevent the spread of COVID-19, staffing plans, and more.
*See, e.g.*, *id.* at 8–10; Dkt. 40-1 at 3 (Pl.'s SUMF ¶ 7).  According to the report, "facilities
reported concerns with their inability to practice social distancing among detainees[] and to
isolate or quarantine individuals who may be infected with COVID-19" and "with the
availability of staff [and] protective equipment for staff, if there were an outbreak of COVID-19
at the facility."  Dkt. 40-12 at 10 (Pl.'s Ex. 8).

Approximately five months after it sent its FOIA request, the ACLU filed this suit,
alleging that DHS had failed to release any of the requested records.  *See* Dkt. 1 at 7–8 (Compl.
¶¶ 14–15).  In its complaint, the ACLU alleged that DHS "hold[s] thousands of immigrants in
detention facilities across the United States" and that "the people living and working in those
facilities are acutely vulnerable to the coronavirus, for multiple reasons."  *Id.* at 2 (Compl. ¶ 3).
To make this point, the ACLU cited, among things, two OIG reports pre-dating the pandemic
concerning overcrowding and sanitation in detention facilities.  *See id.* at 2 & n.3 (Compl. ¶ 3)
(citing Dep't of Homeland Sec., Off. of Inspector Gen., *DHS Needs to Address Dangerous
Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley* (July
2, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-51-Jul19_.pdf); *id.*
at 3 n.5 (Compl. ¶ 3) (citing Dep't of Homeland Sec., Off. of Inspector Gen., *Concerns about
ICE Detainee Treatment and Care at Four Detention Facilities* (Jun. 3, 2019),
https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf).  Although
these reports did not address the COVID-19 pandemic, the ACLU contends that by citing the
reports, it put the Privacy Office on unmistakable notice that OIG's mandate includes

investigations regarding overcrowding and health concerns in detention facilities.  Dkt. 40-2 at
20–21.

After DHS answered the complaint, Dkt. 11, the Court directed the parties to file a joint
status report and set an initial scheduling conference, Min. Order (Dec. 22, 2020).  In the joint
status report, DHS acknowledged that the ACLU had indicated that the records it "expect[ed]
DHS to have" included "Inspector General reports."  Dkt. 12 at 3; *see also id.* at 4 (ACLU noting
that its complaint cited to an OIG report).  Then, at the scheduling conference, the parties
discussed the June 2020 OIG report, *see* Dkt. 14 at 4, 7–9 (Jan. 20, 2021 Hearing Tr. at 4:17–18,
7:11–9:23), and "the possibility that there could be any documents relating to the IG report
within, for example, the secretary's office or" elsewhere at DHS, *id.* at 20 (Jan. 20, 2021 Hearing
Tr. at 20:8–12).  But DHS explained that "DHS headquarters has [had] no contact with the IG
regarding its reports" and took the position that a "wall" separates OIG from the remainder of
DHS, precluding DHS from "speak[ing] to the equities of the IG reports."  *Id.* at 7 (Jan. 20, 2021
Hearing Tr. 7:11–24).

In response, the Court noted that OIG is part of DHS and asked, "so why wouldn't a
request directed at DHS include material held by the inspector general?"  *Id.* at 7–8 (Jan. 20,
2021 Hearing Tr. 7:25–8:3).  The Court added:  "[M]y question is why then shouldn't a request
that is directed at DHS include the inspector general's office[?] . . .  [I]s [there] something in the
regulations that say[s] you have to specify the particular office or component within DHS, and
therefore you don't read their request as reaching the inspector general?"  *Id.* at 8 (Jan. 20, 2021
Hearing Tr. 8:8–17).  Counsel for DHS, in turn, promised to "find out the answer to that"
question, but emphasized "that DHS was very clear that they cannot control the disposition of the
IG reports."  *Id.* (Jan. 20, 2021 Hearing Tr. 8:18–22).  At the conclusion of the hearing, the Court

ordered the parties to meet and confer regarding the search terms and offices within DHS that may have responsive documents.  *Id.* at 21 (Jan. 20, 2021 Hearing Tr. 21:14–19).

The ACLU subsequently sent DHS a list of proposed search terms, as well as a list of proposed custodians at ICE and DHS.  *See* Dkt. 40-10 (Pl.'s Ex. 6).  That list included the "Office of the Inspector General."  *Id.* at 5.  Then, sometime between January 27, 2021 and March 1, 2021, DHS began searching its files for responsive records.  *See* Dkt. 13 (Mar. 1, 2021 Joint Status Report) ("In accordance with the Court's January 22, 2021 Minute Order, defendant ICE processed the 403 pages of documents yielded by its initial search."); Dkt. 40-1 at 4–5 (Pl.'s SUMF ¶ 16) ("Defendants first began to search DHS records sometime between January 27, 2021 and March 1, 2021."); Dkt. 14 at 13 (Jan. 22, 2021 Hearing Tr. at 13:17–19) (proposing that DHS "immediately discuss with the plaintiffs what offices they would like DHS to search, and that we begin those searches").[2]  In October 2021, the parties negotiated over the scope of DHS's search, and, on October 22, 2021, the ACLU offered to narrow the ICE search to three custodians and to narrow the DHS search to four custodians, including OIG.  Dkt. 40-11 at 3 (Pl.'s Ex. 7).  In response, DHS wrote: "since OIG is an independent office within DHS . . . DHS is not permitted to search OIG's records and plaintiffs must instead file a separate FOIA request with OIG."  *Id.* at 2.

Then, on March 15, 2022, the ACLU filed a motion to compel DHS to include OIG in its search.  Dkt. 30 at 1.  The Court construed the motion as a partial motion for summary judgment and denied the motion without prejudice as premature.  Min. Order (Mar. 16, 2022).  After a pre-

---

[2]  This search is separate from ICE's earlier search for responsive records, which located 403 pages of documents.  Dkt. 13 at 1.

motion conference, Min. Entry (Apr. 21, 2022), the ACLU moved for partial summary judgment, seeking a court order requiring DHS to search OIG records, Dkt. 40, and DHS cross-moved on the same question, Dkt. 41.  At this time, according to DHS, it "has completed the production for all FOIA requests made to DHS subject to this litigation, except that the parties dispute whether or not plaintiff's FOIA request properly sought documents from the DHS Office of the Inspector General." Dkt. 53 at 1 (Jan. 25, 2023 Joint Status Report).  The parties' cross-motions for partial summary judgment are fully briefed and ripe for this Court's decision.

## II.  LEGAL STANDARD

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56.  *See, e.g.*, *Shapiro v. U.S. Dep't of Just.*, 153 F. Supp. 3d 253, 268 (D.D.C. 2016).  To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In a FOIA action, "the Court may award summary judgment to an agency solely on the basis of information provided in affidavits or declarations that describe ' . . . the justifications for nondisclosure [of records] with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Thomas v. FCC*, 534 F. Supp. 2d 144, 145 (D.D.C. 2008) (alterations in original) (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action.  5 U.S.C. § 552(a)(4)(B).

## III.  ANALYSIS

Before turning to the substance of the parties' cross-motions for summary judgment, the Court pauses to consider what is not in dispute.  As discussed above, DHS initially resisted the

ACLU's request that the agency's search include records maintained by OIG on the ground that inspectors general are unique officers who are often insulated from oversight by the agencies in which they are housed.  Dkt. 40-11 at 2 (Pl.'s Ex. 7).  In the words of DHS counsel, "DHS headquarters ha[d] no contact with the IG regarding [the] reports" and related material that the ACLU seeks here, Dkt. 14 at 7 (Jan. 22, 2021 Hearing Tr. at 7:14–15), and, indeed, the DHS team was "very clear that they cannot control the disposition of the IG reports," *id.* at 8 (Jan. 22, 2021 Hearing Tr. at 8:20–21).  Since that time, however, DHS has clarified that "OIG is not excepted from the requirement that the DHS Privacy Office must forward FOIA requests to the appropriate component" for processing.  Dkt. 34 at 6; *see also* Dkt. 41-1 at 16.

As a result, the parties now agree that the only question presented is whether the Privacy Office should have forwarded the ACLU's FOIA request to OIG for processing.  Their disagreement on that question implicates both questions of law and fact.

## A.

The Court starts with the law.  As DHS points out, the agency's FOIA regulations provide as follows:

> DHS has a decentralized system for responding to FOIA requests, with each component designating a FOIA office to process records from that component. All components have the capability to receive requests electronically, either through email or a web portal.  To make a request for DHS records, a requester should write directly to the FOIA office of the component that maintains the records being sought.  A request will receive the quickest possible response if it is addressed to the FOIA office of the component that maintains the records sought. . . . Each component's FOIA office and any additional requirements for submitting a request to a given component are listed in appendix A to this part. These references can all be used by requesters to determine where to send their requests within DHS.

6 C.F.R. § 5.3(a)(1).  Appendix A, then, includes, among entries for an array of DHS components, the following:

### *Office of Inspector General*

> All requests should be mailed to the OIG Office of Counsel, 245 Murray Lane SW, Mail Stop—0305, Washington, DC 20528-0305, or submitted electronically through https://foiarequest.dhs.gov/.  To respond to your FOIA or Privacy Act request as quickly as possible, we strongly encourage you to submit your request electronically.   Additional contact information for questions: Phone: 202-981-6100, Fax: 202-245-5217, or Email: foia.oig@oig.dhs.gov.

87 Fed. Reg. 68599-01, 68608 (Nov. 16, 2022).

If the governing regulations and guidance stopped here, one might reasonably argue that DHS's "decentralized system for responding to FOIA requests," 6 C.F.R. § 5.3(a)(1), requires a specific request directed to each specific DHS component or office that the requesters wants the agency to search.  But, as DHS acknowledges, the very next paragraph of the regulations puts any such contention to rest.  The paragraph provides:

> A requester may also send his request to the Privacy Office, U.S. Department of Homeland Security, 245 Murray Lane SW STOP-0655, or via the internet at http://www.dhs.gov/dhs-foia-request-submission-form, or via fax to (202) 343-4011.  The Privacy Office will forward the request to the component(s) that it determines to be most likely to maintain the records that are sought.

*Id.* § 5.3(a)(2).  In other words, a FOIA requester has the option of either submitting its request to the "the component that maintains the records being sought," which carries the benefit of receiving "the quickest possible response" to the request, *id.* § 5.3(a)(1), or submitting it to the Privacy Office, which "will forward the request to the component(s) that [the Privacy Office] determines to be most likely to maintain the records," *id.* § 5.3(a)(2).

According to DHS, by opting for the second alternative, the ACLU left it to the Privacy Office to determine which DHS offices or components were, in its view, "most likely to maintain the records that" the ACLU sought.  Dkt. 41-1 at 7 (emphasis omitted) (quoting 6 C.F.R. § 5.3(a)(2)).  DHS further maintains or at least suggests that that determination is one that is static in time—it applies only at the moment in time when the Privacy Office decides where to

direct the FOIA request—and it does not require the Privacy Office "to look beyond the four corners of the request for leads to the location of responsive documents." *Id.* at 3 (quoting *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996)).  To read the regulation otherwise, DHS adds, would "transform the DHS Privacy Office into a central clearinghouse, compelled to divine the hidden intent of all FOIA requests, [which] would . . . impose an unreasonable burden on that Office." *Id.* at 21.

For several reasons, the Court declines to read 6 C.F.R. § 5.3(a)(2) in this grudging manner.  First, the structure of the regulations makes clear that a requester has two options.  If it submits its request directly to the component that maintains the records at issue, the requester "will receive the quickest possible response."  6 C.F.R. § 5.3(a)(1).  But the alternative path, even if slower, does not limit DHS's obligation to conduct an adequate search for records. Notably, section 5.3(a)(2) recognizes that, at times, more than one component will be "likely to maintain the records" at issue, so it refers to "the component(s)"—rather than to a singular "component"—that are "most likely" to maintain responsive records.  *Id.* § 5.3(a)(2). Understood in this light, moreover, the phrase "most likely" cannot reasonably be construed to require a ranking of components "likely" to maintain records and to permit the Privacy Office to ignore components that are "likely" to maintain responsive records, so long as another component is even more "likely" to have responsive material.

The standard, accordingly, does not differ in material respects from the standard that governs all FOIA requests:  The agency must make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  As section 5.3(a)(2) recognizes, an "agency cannot limit its search to only one record system if there

are others that are likely to turn up information requested." *Id.*  But the agency need not search record systems that are unlikely to yield results.

Second, regardless of the precise meaning of section 5.3(a)(2), in this case DHS represented that the Privacy Office—not ICE—would "respond to [the] request on behalf of DHS *and its components*."  Dkt. 40-6 at 4 (Pl.'s Ex. 2) (emphasis added).  All agree that OIG is a "component" of DHS, and thus, regardless of how one might construe section 5.3(a)(2), the Privacy Office undertook to respond on behalf of OIG, at least to the extent OIG has "responsive records," *id.* at 5 (Pl.'s Ex. 2).  The ACLU was entitled to rely on that representation.

Third, if at any point the Privacy Office were to conclude that that the FOIA request was misdirected and that it should have been sent to OIG, the DHS FOIA regulations speak to those circumstances as well.  Pursuant to section 5.4(c), if "a component's FOIA office"—here, the Privacy Office—"determines that a request was misdirected within DHS, the receiving component's FOIA office shall route the request to the FOIA office of the proper component(s)." 6 C.F.R. § 5.4(c).  In other words, if the ACLU (or if DHS) "misdirected" the FOIA request to the Privacy Office, the Privacy Office is duty-bound to forward the request to OIG.  Either way, the agency cannot ignore the request.[3]

Fourth, and relatedly, although the regulation provides that, "[t]he Privacy Office will forward the request to the component(s) that it determines to be most likely to maintain the records that are sought," *id.* § 5.3(a)(2), there is no indication that the Privacy Office must make

---

[3] Similarly, "[w]hen a component determines that it maintains responsive records that either originated with another component or agency, or which contains information provided by, or of substantial interest to, another component or agency, then," the component must either consult with the other component before responding to the request or may refer the request to the second component.  6 C.F.R. § 5.4(d).  The regulations therefore contemplate that requests may travel between components as more information becomes available.

that determination once and for all time when it makes its initial referral.  *See Protect the Pub.'s Tr. v. U.S. Dep't of Homeland Sec.*, 22-cv-138, 2022 WL 3226275, at *4 (D.D.C. Aug. 10, 2022) (explaining that § 5.4(c) "suggests that requests may not always come directly from the requester, and it implies that this is no reason to refuse compliance with the request altogether.  In the circumstance where CRCL knew that the Privacy Office was an additional intended addressee, for example, one would assume that it would have a duty to forward the request on.").  Had DHS intended to limited section 5.3(a)(2) in this manner, it could easily have done so.

Fifth, decisions from this Court and from other courts have recognized that DHS FOIA requesters need not submit their requests directly to the specific component and, instead, may submit them to the Privacy Office.  *See*, *e.g.*, *id.* (Section 5.3(a)(1)) "encourages—but does not require—people to send their request to the correct office, and it contemplates that some will not do so.  Those requesters will get a slower response, but the regulations do not state that they should receive no response at all."); *ACLU v. U.S. Dep't of Homeland Sec.*, No. 20-cv-10083, 2021 WL 5449733, at *2 (S.D.N.Y. Nov. 19, 2021) ("DHS's implementing regulations concerning FOIA provide that DHS will forward FOIA requests to DHS component offices that are likely to have responsive records.  The regulations make no exception for the Secret Service and the Coast Guard, and DHS has offered no justification for this Court to ignore the applicable DHS regulation." (internal citation omitted)); *Laws.' Comm. for Civ. Rts. Under Law v. U.S. Dep't of Just.*, No. 18-cv-167, 2020 WL 7319365, at *18 (D.D.C. Oct. 16, 2020) ("[F]our individuals that the Lawyer's Committee identified as likely to have responsive records were employed in components other than Headquarters," but "the Privacy Office failed to forward the

request to those components or any others likely to have responsive documents, as required by governing regulations.").

Finally, DHS's concern that the Privacy Office may become overburdened as the "clearinghouse" for DHS FOIA requests is both overstated and, in event, an ill that DHS can remedy by amending its own regulations.  Under existing DHS policy, the Privacy Office is designated as the recipient of all FOIA requests submitted to the Headquarter Offices, including (among others) the offices of the Secretary; Deputy Secretary; General Counsel; Executive Secretariat; Intelligence and Analysis; Legislative Affairs; Public Affairs; and Strategy, Policy, and Plans.  Dkt. 41-2 at 12 (Pavlik-Keenan Decl. ¶ 25); 87 Fed. Reg. 68599-01, 68608 (Nov. 16, 2022).  In other words, by DHS's own design, the Privacy Office is already front and center in processing FOIA requests.  It seems unlikely that reading section 5.3(a)(2) to require the Privacy Office to ensure that the proper components receive other FOIA requests would overwhelm the office.  But, in any event, this assignment of responsibility is a matter of DHS's own choice.  It is free to amend section 5.3(a)(2) as it sees fit.  Unless and until it does so, however, the Court must apply the regulation as written, and fairly construed, it requires the Privacy Office to ensure that the component—or component*s*—that are "most likely" to have responsive records receive the request.

The Court, accordingly, concludes that DHS's responsibility to conduct an adequate search for responsive records was not curtailed simply because the ACLU submitted its FOIA request to the Privacy Office and did not send it to each component that the ACLU believed has responsive records.  And it further concludes that DHS's responsibility is not limited to the moment in which the Privacy Office first forwards the request.  The Court, accordingly, turns to the factual question of whether an adequate search for responsive records must include OIG.

## B.

"An agency has an obligation under FOIA to conduct an adequate search for responsive records." *Ewell v. U.S. Dep't of Just.*, 153 F. Supp. 3d 294, 301 (D.D.C. 2016). The adequacy of an agency's FOIA search "is judged by a standard of reasonableness," *Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984), and "[a]n agency fulfills its obligations . . . if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents,'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). "In order to obtain summary judgment[,] the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68. The agency can show that it conducted an adequate search by relying on "[a] reasonably detailed affidavit [or declaration], setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* And "[a]lthough a requester must reasonably describe the records sought, an agency also has a duty to construe a FOIA request liberally." *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (cleaned up).

As DHS acknowledges, Dkt. 41-1 at 7–9, the Court must therefore evaluate the Privacy Office's decision to forward the ACLU's request to ICE alone for reasonableness, *see Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015) ("This court applies a reasonableness standard to determine whether an agency performed an adequate search."); *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 27 (D.C. Cir. 1998). Whether the Court considers the Privacy Office's decision through the lens of when the Privacy Office first received the request, Dkt. 41-1 at 7–9, when it

commenced the search for responsive records, Dkt. 13 at 1, or at the time the agency concluded

its search, *see Campbell*, 164 F.3d at 28, the Court is persuaded that DHS had reason to believe

that a search of OIG's files would "likely . . . turn up the information requested," *Oglesby*, 920

F.2d at 68.

     At the time the ACLU submitted its FOIA request, OIG was already investigating "*Early*

*Experiences with COVID-19 at ICE Detention Facilities*."  Dkt. 40-12 at 4 (Pl.'s Ex. 8).  That

study spanned the period from April 8 to April 20, 2020, *id.*, before the ACLU submitted its

FOIA request on May 22, 2020, Dkt. 40-1 at 2 (Pl.'s SUMF ¶ 1).  Moreover, even if the Privacy

Office was unaware that this particular study was underway,[4] and even if DHS is not reasonably

charged with the knowledge of all of its components (including OIG), DHS nonetheless had

good reason to believe that OIG would have responsive records.  As noted above, among other

records, the ACLU requested "[a]ll communications and documents regarding COVID-19-

related grievances or *complaints*, including, but not limited to, those discussing access to

hygiene, protective equipment, social distancing or lack thereof, or other risks of exposure to

COVID-19 within immigration detention facilities."  Dkt. 40-5 at 6 (Pl.'s Ex. 1) (emphasis

added).  And, as the Privacy Office was surely aware, OIG is responsible for conducting internal

DHS investigations, *see* 5 U.S.C. app. 3 § 8I(c) ("[T]he Inspector General of the Department of

Homeland Security may initiate, conduct, and supervise such audits and investigations in the

Department of Homeland Security as the Inspector General considers appropriate."), including

investigations triggered by "complaints and information from any source alleging abuses of civil

---

[4] Notably, DHS submitted two declarations from Catrina Pavlik-Keenan, the Deputy Chief FOIA
Officer in the Privacy Office, and in neither did she disclaim knowing that the OIG report was in
the works.  *See* Dkt. 41-2 (Pavlik-Keenan Decl.); Dkt. 46-1 (Pavlik-Keenan Supp. Decl.).

rights and civil liberties by employees or officials of the Department and employees or officials of independent contractors or grantees of the Department," *id.* § 8I(f)(2)(B)–(C).

Even prior to the COVID-19 pandemic, moreover, OIG conducted investigations—and published reports—relating to overcrowding and "unsafe and unhealthy conditions" at detention centers. *See* Dkt. 1 at 2–3 (Compl. ¶ 3 & nn. 3 & 5) (internal quotation marks omitted) (citing reports). Given the significance of the COVID-19 pandemic and the risks it posed to detainees and ICE employees, it should have come as no surprise that OIG was investigating complaints involving "access to hygiene, protective equipment, social distancing or lack thereof, or other risks of exposure to COVID-19 within immigration detention facilities." Dkt. 40-5 at 6 (Pl.'s Ex. 1). Beyond that, the Privacy Office was also on reasonable notice that OIG had been assigned to the Pandemic Response Accountability Committee "to promote transparency and conduct and support oversight of covered funds and the Coronavirus response." 5 U.S.C. app. 3 note § 11(b)–(c) (2022) (Pandemic Response Accountability Committee). In short, "[g]iven . . . the fact that the OIG's mission" includes the investigation of complaints relating to safety and health within detention facilities, and given that it was assigned specific duties relating to the pandemic, "it would strain credulity to find that the" Privacy Office was unaware—or had no reason to believe—that OIG was a "likely repositor[y] of responsive records." *Defs. of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 13 (D.D.C. 2004).

DHS responds that complaints from individuals in custody "would normally be made either to ICE directly, or to the contractor operating the facility in question, both of which would be responsible for handling them" and that "a grievance or complaint at the facility level does not *automatically* result in an investigation by other DHS entities." Dkt. 41-1 at 10 (emphasis added). But that does little to justify DHS's limited search. The Court does not doubt that *many*

complaints and grievances are dealt with at the facility level.  An adequate FOIA search, however, requires the agency to search more than one record system, if "there are others that are likely to turn up the information requested," *Ogelsby*, 920 F.2d at 68, and, here, DHS offers no reason to believe that *none* of the grievances and complaints at issue—including those involving the health and safety of thousands of individuals held in ICE detention facilities—made their way to OIG.  "At the very least, [DHS] was required to explain in its affidavit that no other record system was likely to produce responsive documents."  *Id.*

The common-sense inference that OIG would have responsive records, moreover, finds support in records that ICE has released to the ACLU.  In particular, the ACLU points to three form letters sent from the DHS Office of Civil Rights and Civil Liberties, confirming that "when . . . DHS received complaints from detainees related to COVID-19, [its] practice was to 'send [those] complaint[s] to the DHS Office of the Inspector General (OIG) for review.'"  Dkt. 40-2 at 24 (third and fourth alterations in original) (quoting Pl.'s Ex. 12 at 2, 4, 6) (sample DHS complaint form letter).  DHS fails to explain how the Office of Civil Rights and Civil Liberties knew to send these COVID-19-related complaints to OIG, while the Privacy Office had no reason to believe that OIG would likely possess responsive records.

The ACLU also requested "[a]ll communications and documents regarding Congressional or state-based inquiries into COVID-19-related issues within immigration detention facilities."  Dkt. 40-5 at 7 (Pl.'s Ex. 1).  And by the time the ACLU submitted its request, at least one member of Congress had already requested that OIG investigate DHS's response to COVID-19 in detention facilities.  *See* Dkt. 40-13 (Pl.'s Ex. 9) (April 13, 2020 Letter from Congresswoman Pramila Jayapal).  DHS located a copy of that letter in the search it conducted, which did not include OIG, and it seems almost certain that a copy of that letter—and

any related correspondence—can be found in OIG's files.  If not on day-one, the Privacy Office

was certainly aware of the letter by the time it located the congressional inquiry in its search of

other files.  DHS's response regarding this part of the ACLU's FOIA request is also

unconvincing:  It merely posits that the "Privacy Office reasonably interpreted this portion of the

request as being limited to Congressional or state-based entities, and not extending to any other

oversight bodies."  Dkt. 41-1 at 9.  But that interpretation is unreasonable, because it ignores the

evidence that OIG received the type of congressional inquiry that DHS concedes falls with the

scope of the FOIA request.

DHS also argues that "at the time of the request, ICE was the only entity responsible for

assessing and addressing the risks of COVID-19 in immigration detention facilities."  Dkt. 41-1

at 8–9.  In support of this proposition, DHS relies on the declaration of Deputy Chief FOIA

Officer Catrina Pavlik-Keenan, who attests that "[t]he management of detention facilities,

deportation of detainees, and care and treatment of detainees while in other than temporary

custody are exclusively the responsibilities of ICE and do not involve other DHS components,"

Dkt. 41-2 at 7 (Pavlik-Keenan Decl. ¶ 13), and that "ICE was the only entity responsible for

assessing and addressing the risks of COVID-19 in immigration detention facilities," *id.* at 8

(Pavlik-Keenan Decl. ¶ 14).  That is a non sequitur.  ICE indisputably had frontline

responsibility for managing its detention facilities.  But OIG, indisputably, had responsibility for

conducting all investigations that the Inspector General considered appropriate, 5 U.S.C. app. 3

§ 8I(c), and it had a history of investigating allegations of overcrowding and health risks at ICE

detention facilities.

Although the Court is persuaded that, from the outset, the Privacy Office had good reason

to request that OIG perform a search for potentially responsive records, by the time DHS (as

opposed to ICE) commenced its search in early 2021, there was little doubt that DHS would find potentially responsive records in OIG's files.  DHS did not begin its search until January 27, 2021 at the earliest.  Dkt. 40-1 at 5–6 (Pl.'s SUMF at ¶ 16).  Before then, DHS had received at least the following leads pointing to OIG as a likely source of records: (1) in the parties' January 15, 2021 Joint Status Report, DHS had acknowledged that the ACLU had informed the Privacy Office that "Inspector General reports" were among the "records it expects DHS to have," Dkt. 12 at 3; (2) at the January 22, 2021 Initial Scheduling Conference, the parties had discussed at length that same report, which the Court described as a "very responsive document," Dkt. 14 at 7 (Jan. 22, 2021 ISC Tr. at 7:3–8); (3) the OIG's report on "*Early Experiences with COVID-19 at ICE Detention Facilities*" had been released months earlier, Dkt 40-12 at 2 (Pl.'s Ex. 8); (4) on January 27, 2021, the ACLU had sent a list of requested custodians to DHS, and that list included the "Office of the Inspector General," Dkt. 40-10 at 5 (Pl.'s Ex. 6); (5) as noted above, ICE had located records of complaints related to the handling of the pandemic at ICE detention facilities that were directed at OIG, Dkt. 40-13 (Pl.'s Ex. 9); and (6) ICE had produced an email captioned "EL VALLE—OIG review 20-051 (COVID in detention facilities)—Unannounced Virtual Inspection" that referred to "OIG's planned virtual inspection of the El Valle Detention Facility for Audit OIG-20-051 (COVID-19)," Dkt. 40-14 at 2 (Pl.'s Ex. 10).

DHS does not dispute, nor could it dispute, that under controlling FOIA precedent an agency must follow clear leads that develop over the course of its search.  *See Mobley*, 806 F.3d at 582 ("[A]n agency may not ignore a request to search specific record systems when a request reaches the agency before it has completed its search . . . ."); *Campbell*, 164 F.3d at 28 ("An agency has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge

19

during its inquiry."); *Coleman v. Drug Enf't Admin.*, 134 F. Supp. 3d 294, 302 (D.D.C. 2015). Or, put differently, the reasonableness of a search must be assessed based on the information the agency has at the conclusion, not the beginning, of its search.  *See Campbell*, 164 F.3d at 28 ("Consequently, the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception."); *Sai v. Transp. Sec. Admin.*, 466 F. Supp. 3d 35, 51–52 (D.D.C. 2020); *Am. Oversight v. U.S. Gen. Servs. Admin.*, No. 18-cv-2419, 2020 WL 1911559, at *6 (D.D.C. Apr. 20, 2020).  Because DHS was unquestionably on notice that OIG likely possessed responsive materials before DHS even started, much less completed, its search, it was required to search OIG's records.

In support of the notion that the Privacy Office was not required to consider information gained after the ACLU submitted its request, DHS invokes *Kowalczyk v. Department of Justice*, 73 F.3d 386 (D.C. Cir. 1996).  Dkt. 41-1 at 18–21.  There, the plaintiff had sent a FOIA request to the FBI headquarters in Washington, D.C. for records related to his federal criminal case. *Kowalczyk*, 73 F.3d at 387–88.  The FBI searched its Washington headquarters for responsive records.  *Id.* at 388.  Four months after the search, the plaintiff sent a letter to the FBI, which suggested that the FBI should also have searched the New York field office for potentially responsive records.  *Id.*  In addressing whether to consider that letter, the D.C. Circuit concluded that "[a] reasonable effort to satisfy [a FOIA] request does not entail an obligation to search anew based upon a subsequent clarification," because "[r]equiring an additional search each time the agency receives a letter that clarifies a prior request could extend indefinitely the delay in processing new requests."  *Id.*  Applying this principle, the D.C. Circuit concluded that the plaintiff's initial request "did not enable the FBI to determine that the New York field office had responsive records."  *Id.* at 389.  The court explained that "the Bureau is not obliged to look

20

beyond the four corners of the request for leads to the location of responsive documents." *Id.*

The court then concluded:

> If the agency may reasonably interpret the request to be for records in a specific
> office or offices only—the office to which the request was sent or any office(s)
> named in the request—then upon discovering that it has other responsive records
> elsewhere, it may reasonably infer that the requester already has those records,
> is seeking them through a separate request, or, for whatever reason, does not
> want them.  If, on the other hand, the requester clearly states that he wants all
> agency records on a subject, i.e., regardless of their location, but fails to direct
> the agency's attention to any particular office other than the one receiving the
> request, then the agency need pursue only a lead it cannot in good faith ignore,
> i.e., a lead that is both clear and certain.

*Id.*

*Kowalczyk* is inapposite for at least three reasons.  First, in that case, the plaintiff sent his

clarifying letter *after* the FBI already *completed* its search.  *Id.* at 388.  Here, by contrast, the

ACLU informed DHS that OIG is a likely source of responsive records on numerous occasions

*before* DHS *commenced* its search.  Dkt. 12 at 3; *see also id.* at 4 (ACLU noting that its

complaint cited to OIG reports).  The concern identified by the D.C. Circuit then—that plaintiffs

would indefinitely extend their FOIA requests by sending clarification letters—is not present

here.  Second, unlike in *Kowalczyk*, DHS's initial belief that the ACLU's FOIA request did not

encompass OIG records was baseless.  *See supra* at 15–18.  And third, unlike in *Kowalczyk*, the

ACLU did not limit its FOIA request to a particular office—even by implication.  To the

contrary, as the Privacy Office recognized, the ACLU sent a separate request to ICE and

intended the request that it sent to the Privacy Office to encompass any other DHS component

likely to have responsive records.[5]

---

[5] *Amiri v. National Science Foundation*, No. 21-5241, 2022 WL 1279740 (D.C. Cir. Apr. 28,
2022) (per curiam), is similarly distinguishable.  There, the court concluded that National
Science Foundation Office of Inspector General was not required to respond to the FOIA request

DHS's reliance on a footnote in *Stein v. CIA*, 454 F. Supp. 3d 1 (D.D.C. 2020), is also misplaced.  In *Stein*, the plaintiff sent a copy of his FOIA request to the Department of Justice's ("DOJ's") Mail Referral Unit ("MRU"), "a part of DOJ's Justice Management Division that accepts FOIA requests from requesters who are unsure which DOJ component may possess the records they seek."  *Id.* at 11.  The plaintiff challenged "perceived inadequacies at the referral stage, arguing that the agency did not present '*any* evidence' supporting the MRU's determination that [the Office of Information Policy] and FBI were the only DOJ components likely to possess records responsive" to his request.  *Id.* at 25 (emphasis in original).  The court agreed, holding that DOJ's declaration failed reasonably to explain MRU's determination.  *Id.* In a footnote, however, the court rejected the plaintiff's argument that "MRU's finding that 'OIP was one of the components most likely to have' responsive records was inadequate to justify referring the request only to OIP."  *Id.* at 25 n.9.  The court concluded that the plaintiff was "making a false equivalence between an agency's referral of a FOIA request to a specific component and a search of a records systems within an agency component," and that, while the D.C. Circuit had held that searching only a records system "most likely" to have responsive materials is inadequate, it had not held that referring to only a component "most likely" to have responsive materials is also inadequate.  *Id.* (citing *Mobley*, 806 F.3d at 582).  Here, in contrast, the ACLU argues that DHS's failure to include OIG in its list of components "most likely" to have responsive records was unreasonable, and the Court agrees.

---

because the plaintiff "did not send his January 2020 FOIA request to the Office of Inspector General, which handles FOIA requests separately," and because the agency "had no obligation 'to look beyond the four corners of the request.'"  *Id.* at *1 (quoting *Kowalczyk*, 73 F.3d at 389). There is no indication in *Amiri*, however, that the plaintiff clarified that OIG was a likely source of records before the agency began its search.  And, again, the four corners of the ACLU's request encompassed OIG records.

Much more on point are the sea of cases standing for the proposition that an agency must follow leads that develop during its search.  *See, e.g.*, *Negley v. FBI*, 169 F. App'x 591, 595 (D.C. Cir. 2006) ("[A]n agency 'must revise its assessment of what is reasonable in a particular case to account for leads that emerge during its inquiry.'" (quoting *Campbell*, 164 F.3d at 28)); *Valencia-Lucena*, 180 F.3d at 325 ("[T]his court has required agencies to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents."); *Coleman*, 134 F. Supp. 3d at 302 ("[T]he court finds that the 1996 and 2004 Letters constituted the type of 'clear lead' that required the DEA to expand its initial search to include the office of the Deputy Assistant Administrator."); *Rollins v. U.S. Dep't of State*, 70 F. Supp. 3d 546, 550 (D.D.C. 2014) (explaining that agencies may not ignore "*clear leads*" that indicate "other offices that should have been searched" (emphasis in original)); *Neighborhood Assistance Corp. of Am., v. U.S. Dep't of Hous. & Urb. Dev.*, 19 F. Supp. 3d 1, 10 (D.D.C. 2013) ("But even assuming this approach was proper initially, it does not follow that, during the course of its review, HUD could then ignore indications that responsive documents were likely to be located elsewhere.").

*   *   *

At least in a case like this one, where DHS was on notice before it even commenced its search—that is, it certainly should have known before starting its search—that responsive records will almost certainly be found in OIG's files, it must search those files.  In other words, without conducting such a search, DHS will be unable to carry its burden of demonstrating that it conducted a search "reasonably calculated to uncover all relevant documents."  *Truitt*, 897 F.2d at 542 (quoting *Weisberg*, 705 F.2d at 1351).  Partial summary judgment is therefore warranted in the ACLU's favor.  *See New Orleans Workers' Ctr. for Racial Just. v. U.S. Immigr. &*

*Customs Enf't*, 373 F. Supp. 3d 16, 39 (D.D.C. 2019) ("[T]he plaintiffs have identified evidence demonstrating that the defendant failed to search at least six of its offices likely to possess responsive records," and so the "search was unreasonable.").

## CONCLUSION

For the foregoing reasons, the ACLU's motion for partial summary judgment, Dkt. 40, is **GRANTED**; and DHS's motion for partial summary judgment, Dkt. 41, is **DENIED**.  The Court hereby **ORDERS** that DHS include OIG in its search for responsive records.

**SO ORDERED**.

           /s/ Randolph D. Moss
           RANDOLPH D. MOSS
           United States District Judge

Date:  March 31, 2023